Good morning, my name is Evelyn Durkee. I represent the Federal Defendants. I'm sharing time today with Tribes Council, and we'd like to reserve five minutes for rebuttal. So let me get started. The plaintiffs in this case brought the case to challenge Reclamation's decision to replace water for the Trinity River Dams in August and September of 2013 to prevent catastrophic salmon die-off downstream of the dams in the Lower Klamath River like that, which occurred in 2002. The Lower Klamath River refers to the segment of river between the ocean and the confluence of the Trinity and Klamath Rivers. The Trinity River is the largest tributary of the Klamath River, and salmon that originate in the Trinity River must swim through the Lower Klamath River on their way to and from the ocean. Before I get immersed in the legal authority issue, I just want to make sure that I tell the court today where Reclamation is and its process to develop a long-term plan for the protection of adult salmon in the Lower Klamath River. Since briefing, Reclamation has issued a draft environmental impact statement in October. The comment period on that closed December 5th, and currently Reclamation plans to have a final EIS in January and a record of decision in February of next year. Which will allow for more water than the firemark? Well, I tell them we have the record of decision. Well, I realize that I understand what you're telling us, but what you're doing, I realize, so I don't get the details. Assuming that that becomes final, what it would authorize to release more water? The preferred alternative would allow release of more water than the ROD releases under the authority of the 1955 Act. But there's also an alternative in there, which is the one that plaintiffs have. And what's the use of authority under the proposed plan? Under the proposed plan, and thus far they have cited the first proviso, the 1955 Act, the fish preservation provision, and the second proviso, which is not at issue today, but there's a second proviso in the 1955 Act that provides for downstream releases in 50,000 acre feet. So, the new proposed EIS under the new ROD is still alive for the authority under this project? Under the preferred alternative, yes, but what I was going to say, another alternative that is being considered in the EIS would be to use the ROD releases instead. At least, at least in some part. I'm sorry, the Act, I'm sorry, I'm talking in jargon, but to use the 2,000 record of decision releases under the, that were, you know, part of the improved finance. This is the position that plaintiffs have taken here, which is that rescheduling of those releases. What year is that Act? I'm thinking about that Act. This would be the 1992 Act. This would be the 1992 Act, I see. Right. And so, I think the preferred alternative is a combination of using those releases and some supplemental releases under the 25 Act. I'm not going to go into that project further, but just some ways to understand it. So, what you're saying is, what we say today, or if we say anything today in our decision about, not today, I mean the day we issued that decision, or in this case about the authority under the 55 Act, will presumably directly impact the proposed EIS or ROD, right? Right. That's our concern in bringing this appeal, even though clearly the action is on our side. I was going to say, I was going to ask you this question. What's the point of all of this? There's no damages. B is also the past. You know, it's literally water under the dam, right? So, I was just wondering why we're here. Well. So, I mean, it's basically what I said. We're here because there is another action that depends on the substantiation of the same statute. Correct. Although, I would also point out that the long-term plan is designed to cover the years of 2017 to 2030, and therefore it wouldn't fall, you know, once it's issued, I don't think it would necessarily fall within the capable of repetition yet of any review analysis here. Counselor, there was one question that I had with this, which goes along with my good colleague's questions. Why did we have to get to the 1955 Act in this particular action? Well. I mean, it seems to me that what was alleged by your opposition were allegations that didn't necessarily have to do with the 1955 Act, but violations of other acts. And the district court very quickly said there were no violations of those acts, but it went on to say 1955 doesn't give you any authority to do this again. My question was, why did he have to get to that? Well, I don't know that he had to get to that, quite frankly. I think that the plan. If he didn't have to get to that, why are we getting to it on appeal? Because the court. We're not supposed to deal with hypothetical questions. We're not supposed to deal with questions that are yes, yes. We're supposed to deal with something that's absolute. And it seemed to me that reading very carefully what they alleged did not suggest the 1955 Act was involved at all. Well, we certainly would be satisfied if the court would recognize that the court's holding or discussion, as you will, on the 1955 Act, went beyond the claims in this case. But we were faced with a judgment in which the court said, I'm going to make a declaratory judgment on this issue, and it significantly said issue, not claim,  Yeah, I have much the same question as Judge Smith. And here's how I presented my claim last night. And it was very late, and we were quite fuzzy. It was the actions of the district court talk on the summary judgment was one of the final judgments. They were just orders. But then eventually what was entered was the final judgment that looked to me like a declaratory. There was nothing in the complaint that asked for a declaration, asked for an injunction, or I forget exactly what it was asked for. But eventually the parties came up with proposed judgments, the way it looked like, and then the court sort of melded the two positions and came up with what looked to me like a declaratory judgment. And despite the fact that we're not supposed to give advisory opinions, and it's declaratory judgment, that is, we don't have jurisdiction to enter declaratory judgment. So that's sort of without my answer. But I just want to address this question today. That was just entirely soliciting. I mean, obviously, is that the government's position? Is that a declaratory action? Is that how we get jurisdiction to talk about this? Well, I believe that if I recall correctly, and I apologize in front of them, I believe that their complaint did ask for a declaratory judgment. Well, whatever they asked for, the federal rules say you can enter judgment, confront proof, and so on. So whatever they asked for, we look at final judgment. It doesn't appeal to me. It looks like a declaratory judgment. Yes. That's what it looks like to me as well, so declaratory judgment. So let's get to the 1955 Act. Why is it applicable? It's applicable because the language of it clearly allows this kind of releases. It provides as a limitation on the integration of the, you know, the Trinity River Division into the Central Valley Project as authorizing and directing the Secretary of the Interior to adopt appropriate measures to ensure preservation and propagation of fish and wildlife. And that provision was never repealed expressly or impliedly, and it's the kind of language, this is precisely the kind of thing that Congress wanted to provide authority for reclamation to do, which is to prevent a massive catastrophic die-off of salmon. Well, in fact, what the district court said was it doesn't apply other than in the primitive Trinity River. I realize that's what the court said, but I think it's telling that not a single party here defends that, because there is nothing in the statute which would provide for a geographic limit like that, and ordinarily a court doesn't read in elements that aren't there. It says, including but not limited to, the maintenance of the flow of the Trinity River. Right, and that does not mean it's geographically limited to the Trinity River. Flow has to be measured as of a particular point, and I would suggest that what it was saying there was that, you know, you have to have a point on which you're measuring and which CFSs, but also that it's including but not limited to. I understand. So if I find that a pretty broad statute, where am I going to go to determine just exactly what it means? Well, I think that... I mean, I don't think it's absolutely clear and unambiguous, so where am I going to go? Well, I think that, you know, if you have broad language, you still can apply broad language, but where do you go? You go to what is the reasonable interpretation, which is what the Reclamation and the tribes have provided here. Well, don't hang on to legislative history. Well, you can go to legislative history, and it supports our position. How does the Spencer Declaration support your position? Because it was showing that the priority or, well, first of all, it says that only a small amount would be sent to the Central Valley Project. It says that they would. It mentions the Klamath River Basin. It talks about money and that this project would be gained and even improve the fisheries. I would like to answer more questions, and I will if you'd like me to, but I'm also cognizant of the time, and I think it's important that you hear from the tribes. So if I may stop there, thank you. Good morning, your honors. I'm Tom Slosser on behalf of the Hookah Valley Indian Tribe. The tribe believes the secretary has authority to protect these fish when they're migrating through the lower Klamath River. You could easily call that stretch of the river the lower trinity. That's the only way to the ocean. In 1948, it is called the lower Klamath River. That's correct. But in 1955, Congress thought it was doing something good for the Klamath Basin. Why was that? It was because Section 2 directs the secretary to meet the needs of the basin. Judge Smith asked about Commissioner Spencer of the Bureau of Reclamation. I'd also get in the way of you if somebody wants to continue. You are now arguing that the 65 Act is authorized. Yes, your honor. I just want to make sure what it was going to. And you're not asserting that the lower Klamath is part of the Trinity River Basin, correct? We're not asserting that, your honor. The Trinity flows into the Klamath and then to the ocean. The Trinity is part of the Klamath Basin. I looked it up here. Yes. Mr. Spencer said, and I'm quoting, We have been acutely aware of the importance of not depriving the basin of origin of water, which it needs now or will ever need. And when we have long-term droughts, as we have had, there are special needs for water. And the Trinity, the Klamath Basin, had the priority for use of that water. The 1955 Act is the organic act for this project. And it gave the Secretary of Interior a big tool for assisting fisheries, and that was potential use of this reservoir. And so when the drought occurred and fish flows below the Trinity in the Klamath became so low that the fish were endangered, the Secretary had authority to take actions to preserve fish. Congressman Clare Engel, for whom the reservoir was named, said, Whatever is necessary to maintain and propagate fish in the Trinity River, he, the Secretary, is by the legislation, if it is enacted, instructed to do. So the 1955 Act brought authority, was used to make these water releases. It was used in the 1970s when fisheries problems were first detected. It has never been repealed. The plain language of the Act authorizes these releases. So that's the assertion that maybe 3406B23 implied a restricted or limited scope of the 1955 Act? The B23 simply doesn't say that. And B23 is a statute enacted for the benefit of Indians. It refers specifically to Opah. The restoration program under B23 is for a particular stretch of the Trinity River. It was not addressed in case of drought problems. Thank you for your time. Thank you. Okay, we'll get a photo on the side. May I have one more? Oh, who's that? You, sir. Thank you, Your Honor. May it please the Court, I may be Cordelis, General Counsel and member of the Yurok Tribe, intervener defendant in this case. The federal government's reliance on Proviso 1 of the 1955 Act to provide the fall flows is supported by and consistent with the federal government's trust obligations to the Yurok Tribe because the fisheries, excuse me, because the fars were necessary to prevent another devastating fish kill on the lower Klamath River. Well, that sounds good, but no place does the government talk about the trust obligations. Your Honor, in the record, they've talked about the trust responsibilities. What they say, and I'll read it, giving authority to implement the 2013 flow augmentation releases is totally the 1955 Act. It doesn't talk about the tribal trust responsibilities as an independent source of authority. Your Honor, the FONSI, which is in the record, states that the trust responsibility is additional support for the federal government to implement. Well, additional support, but not something used. That's right. It's additional support here. And in the context of this case, the trust responsibility is a pillar of the Yurok Tribe's relationship with the federal government. And how we look at it here. How can I use the other source of authority offered by you if the government didn't use it at all? The government used it as additional authority. Where? In the FONSI, in which they said that's how they were moving forward with the action here to provide the farms. Let me look at that again. I didn't see it. Well, in this court in Kibabe, Ryan held that the federal trust responsibility applies to all federal actions, and that requires the United States to protect the Yurok fishery when operating the Trinity River Division. Reclamation must exercise its statutory duties, like those in the 1955 Act, regarding reclamation projects affecting the Klamath River, consistent with its trust obligation to protect the Yurok fishery. If you use the FONSI, I continue to subscribe to you. Yes, Your Honor. And I would be, if you look to ER 20, page 225 and 226, I believe that's where it's at. That's where I'm signing to. Your Honor, I am working with my co-counsel to clarify that, but I believe that's accurate. And I just want to note that the United States, through 1855 and 1891, executive orders reserved for the Yurok people the Lower Klamath River itself, and one mile on either side of the river from the Pacific Ocean to the confluence of the Klamath and Trinity Rivers. And this reserved the entire Lower Klamath River for the Yurok people. As this court noted in Eberhard, that created a trust responsibility for the federal government to protect our fishery, a fishery that the court noted is not much less necessary to the existence of the Yurok people than the atmosphere they breathe. In this case, how I see the trust responsibility supporting the federal authority in the 1955 Act is that the 1955 Act requires the federal government to provide water, protect fish. The trust responsibility requires the federal government to take actions to protect the Yurok people and our fishery. When you read those together, the statutory and trust obligations in a commensurate way, which is what the court has done in Eberhard, that requires a holding here that the federal government has authority to provide the farce. Thank you, Your Honors. Thank you. Good morning, Your Honors. Daniel O'Hanlon appearing on behalf of the Cross Appellants, San Luis and Delta Muna Water Authority and the West Coast Water District. I'd like to begin by addressing the question just asked about reliance on the tribal trust doctrine. The government did not rely on the tribal trust obligation as independent authority for the releases here. There is mention of the tribal trust obligation in the various environmental documents, but they do not rely on it as independent authority. In fact, the district court in the briefing on summary judgment asked for a supplemental response by the federal defendants as to whether they were citing the tribal trust as independent authority, and they said no. The district court relied on that in its summary judgment. To what extent can a court that's trying to interpret the statute, the 1955 Act, look to the tribal trust doctrine as a factor of consideration in the interpretation of the statute? The doctrine, I think, is relevant to the Secretary's application of authority, and the Secretary has under statute. So I think it informs how the Secretary applies the statutes, but the agency of the briefing comes from Congress by statute. Why doesn't the 1955 Act clearly authorize this? I sort of don't get it. I know the district court said that, but why should walk me through the Act? Yes, and the question asked about essentially why are we here. That's a different question. Okay. That's a different question. So if you want to ask a different question, then you can go ahead and pose a different question and answer it when you have some time to do it. But now I asked you a specific question I asked you. Yes. Why doesn't the 1955 Act say any of its own terms authorize this? Because for several reasons, the first of which is the authority to make releases where the Trinity River fishery is now governed by Section 3406B23 of the Central Valley Project Improvement Act. Where does it say that that is exclusive and just overrules or invalidates anything with regard to the 1955 Act? It does not mention the 1955 Act expressly, but the subject and the fact that it doesn't and that it only mentions the Trinity River and the Trinity Basin would give you some idea that the 1955 Act, if it applies to the Klamath at all, is not modified by B23. The text of Section B23 refers to the Trinity River fishery. It doesn't refer to a geographic place, the Trinity River Basin. It refers to the fishery, and that's critically important because as you said in the briefs that you already heard this morning, the fishery spawns in the Trinity River, goes down the Trinity River, down the lower Klamath River to the ocean, and then back up. So the fishery is not geographically defined to the basin. So what we just admitted seems to be that it is, just because it is in the basin, because it was supposed to be in the basin, seems to be that your argument in your brief is the fishery equals fish. Yes. And therefore, it is greater than just the basin. Yes. But I guess why would Congress use fishery when one could have used fish? Because it used fish in the statute many times. Yes. In fact, I can quote you some of those times. It specifically used fishery, and it specifically used fishery as it related to the Trinity Basin. Which gives another indication that this B-23 does not relate other than as to the Trinity Basin, and therefore if it doesn't amend the 1955 Act, the 1955 Act might have to do with the Klamath River. Your Honor, I respectfully disagree with the conclusion from the text. The fishery, in fact, does refer to the fishery. And I think the reason for that is because the purpose of the statute was to try to restore the population, which had declined since the project was built, so that it would support the tribes fishing and fishing by others. So reference to the term fishery, which this Court referenced in the 2004 decision involving the Environmental Impact Statement for the 2005 River Decision, defined that, and I believe it's footnote one, using a statute, another statute, and essentially fishery means a group of fish for conservation and management, often defined by geographic terms in terms of where those fish spawn, then a unit for management essentially, and also means the fishing of that resource. And so I think the use of the term fishery was consistent with and reflected the goal of the statute to restore the population so that it would support fishing by the tribes and others. You never answered my question. I'm going to give you one more chance, and if you don't, I'll just let it go. The question I'm asking about the 1955 Act and why it didn't authorize this, and you talked about how other acts proceeded and so on, but I'd like to focus on the 1955 Act. Are you conceding that the 1955 Act authorizes the release of the water? No. Okay, explain to me why not. Because in context, that provision in Section 2 of the 1955 Act was intended to address the impacts of the Tornado River decision. You know, intended used to be a good argument, say, four years ago before Justice Scalia came along, but it's no longer good. We look at statute, not intent, and what we do is usually we look at statutory language, and I look at the statutory language, and to me it says nothing like what the district court said or said. So why don't you pull the language and let's go over it together, and just explain to me why the 1965 Act doesn't authorize exactly what the government did here. The language in Section 2 in the First Divisio itself refers to fish and wildlife, and I would agree with the court. Yes, it does. Yes. It does. And I would agree with the court that that in itself does not have a geographic limitation to the base. That in itself, when statutes are construed, I'm sorry, when you say that in itself, what does in itself mean? I mean, this language clearly authorizes, or at least it says the Secretary is authorized and directed to adopt appropriate measures to ensure the preservation of propagation of fish. Yes. There's no geographic limitation on that. It just talks about propagation of preservation of fish, and it may do so by including, but not limited to the maintenance of flow of the Trinity River. So it can do that by varying the flow of the Trinity River. So why is that exactly what they did here? They varied the flow of the Trinity River in order to preserve, it was authorized and directed to ensure and preserve the propagation of fish. Why isn't this just exactly what they did here? Our primary argument is that this, that authority has been replaced and subsumed by. I know that's the argument I told you you were making, because you didn't want to deal with this section. And if you want to go back to that argument, I'm sorry, but tell me about it here. Won't it distract from the question? It doesn't help at all. It just tells me that you don't have a good answer. So do you want to answer something about this statute? Yes. Okay. So don't talk to me about the 86 Act or the 82 Act or anything else. Talk to me about this section. What is it about this statute that limits the authority of the government to do exactly what it did? It answers nothing, but there are other things. That's fine. We can move on to those other things. I believe, Your Honor, the purpose and context of the statute limit the measures taken under that proviso to measures necessary to address the authority of river division. Why? I mean, what is the context? The section doesn't say that. It just says preserve and propagation of fish. Fish swim all over, right? It's not like a pond. They swim and go from one river to another, and they go all the way to the ocean. So it does not limit where the fish are. What it deals with is how it's done, and that has to do with raising and lowering the level of the trinity. And that's exactly what they did, right? They released more water than was raised over the level of trinity. What is it about this statute? What else is there? What other section can you point me to that undermines that, including section one of the act? Okay, and what does that say? It identifies the principal purpose for the construction of the Tray River Division as being to provide water supply and hydropower for use in the Central Valley. And that's applicable here and important here in terms of understanding. Okay, what does that have to do with where the fish are? Does the court seem to think that this only authorizes the preservation and propagation of fish in the trinity and not in the lower Klamath? Yes. But what does the fact that there are other purposes in the statute have to do with the question whether this authorizes this purpose? Because the question would be, how far can those measures go? What can those measures address? The particular conditions that were being addressed by these releases in August and September of 2013 were not conditions that were caused by the operation of the Tray River Division. At that time of year, it's actually a low-flow time of year. What Reclamation was doing was releasing far above natural flows to the Tray River to compensate for low flows in the lower Klamath. You make it sound so nasty. So what? Well, why isn't this exactly what the section authorizes? And what is there also in the statute that includes that? Give me some language. Well, Your Honor, I do have language. Yes, the language in Section 1, which identifies there is a purpose. Let's read them together. What does Section 1 say? Is it consistent with Section 1? Do you have Section 1? I do not, Your Honor. I do not have it. We removed it by heart. I do know, Your Honor, that it identifies the principal purpose. And what does it say? So we don't have Section 1. We came prepared. I also gave you Section 1. Principal purpose of increasing the supply of water available for irrigation and other beneficial uses in the Central Valley of California. That's right. That's the language that I'm relying on. And the reason it's not. How does that do anything? I mean, because you've got Section 2 that says, also authorized to help the fish. So I'm assuming the position is they can never utilize Section 2 as far as it compares to Section 1. No. Isn't this why the agency has given out two different missions, and its mission is to then balance the two directives. Your Honor, the reason it's implicated, that purpose is implicated by language in Section 2, is going to the meeting of what is an appropriate measure. And the intent. How does it release the water? What other measure do they take? Well, there are a variety of measures that have been discussed in the briefs, the habitat and rehabilitation, other measures. Reducing sediment into the main stem, so forth. There are a variety of measures that can be used. Did you argue in your brief that there were two measures they could have used? One was they could have just divided by the B23 directive and transferred some water in August or September. But the second one seemed to fly dead in the face of what you're arguing here. It said, or buy water. Yes. If they bought water, they're going to release more water. Yes. So how does that help your argument? Because that suggests that they do have the obligation. It's just that they had to go buy it rather than release what is in the dam. The argument may be broader. But I'm not worried about the arguments you're making. I'm worried about how it now affects your answers to my colleague. Because those are the questions I have thought about. If it's not ambiguous, as you suggest, then we've got to look at the language itself. And your argument that we could go buy some and release it does not seem. In fact, it contradicts the position that the 2000 Rock placed an absolute cap on the water that they could release. The option is available because, which says if the option is available, they can release more. All you're arguing is they've got to go find it someplace else. They can't take it from the dam. But that's not the argument. Your argument is there's a cap regardless. If they buy new water, they're still going to go with the cap, which makes Judge Kaczynski's questions that more. And, Your Honor, understanding what was effectuated under B-23 is the answer to your question. It is the answer. Because your conclusion is just opposite of what you're now arguing, that B-23 is a cap. And that's it. You've either got to do it during the time where you can put it back, or, and your second argument was the one that was the most confusing to me, or go buy some. Yes, Your Honor. And the reason is because the rod was intended. And if they buy some, they're going to go over the rod. They're going to go over the anchorage in the rod. They're going to give more down the river than the rod would allow. So why is it that 1955 does not then apply to allow them to buy some and put it over the river? Well, Your Honor, the balance that was struck in the rod was between how much goes down the river and how much is taken from other uses for the Central Valley Project uses. If Reclamation purchases the water, effectively, that they're not taking the water from those other uses, and that they are putting more down the river, yes, which the 1955 Act allows them to do. Although it doesn't allow them to, B-23 limits them to the volumes in the rod when they're taking water from other uses in the Central Valley. If they acquire water, they are not effectively taking water from other uses in the Central Valley. Well, I'm still confused, but okay. I mean, the Section 2 talks about limiting the maintenance of the flood water to the river. They specifically talk about limiting or eliminating the flood water to the river. That's a legitimate thing they can do. So I don't see how you can argue that's a superstition. But there it is. Anything to add? No, Your Honor. Okay. You have a little time for rebuttal. I think it might be 30 seconds. We'll make it a full minute. You want to share it? Mr. Schlosser would like me to share it, so I just want to make that two quick points. On the causation argument, I'd like to point out, first of all, this is an absolutely new argument on appeal. They didn't raise it before in the comments. And secondly, and there's a 1979 splitter opinion that's discussed in our brief where it points out that this provides or operates as a limitation and a priority for in-basin use of the Trinity River Division. And the last thing I'll say is if you look at the Improvement Act 3406B, at the very beginning it says that the Secretary shall, it must, you know, the Secretary shall operate the CBP to meet all obligations under state and federal law. It's right in there that it was not to repeal other statutes. Okay. Thank you. Cautious arguments. That's what we are doing.
judges: Kozinski, N.R. Smith, Gleason